**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
KENNETH ANTOINE CHLOE,

            Plaintiff,

v.                                    Civil Action No. 20-3090
                                      (EGS)
GEORGE WASHINGTON UNIVERSITY,

            Defendant.
```

<u>**MEMORANDUM OPINION**</u>

## I.   Introduction

Plaintiff Kenneth Antoine Chloe ("Mr. Chloe"), proceeding *pro se*, brings this action against Defendant George Washington University ("GWU" or "the University") alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, in connection with the termination of his employment as a plumber with GWU. *See* Compl., ECF No. 1. Mr. Chloe alleges that GWU knowingly terminated him while he "was actively on" FMLA leave, thereby retaliating against him and unlawfully interfering with his rights under the FMLA. *See id.* at 3-4.[1] Pending before the Court is GWU's Motion for Summary

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF header page number, not the page number of the filed document, with the exception of deposition testimony, which is to the page number of the deposition transcript.

Judgment. *See* Def.'s Mot., ECF No. 44; Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. ("Def.'s Mem."), ECF No. 44-2. Upon careful consideration of the pending motion, the opposition, the reply thereto, the applicable law, and the entire record therein, the Court **GRANTS** GWU's Motion for Summary Judgment.

## II. Background

### A. Factual Background

The following facts are undisputed.[2] GWU hired Mr. Chloe as a plumber in October 2011 and promoted him to the role of Senior

---

[2] Pursuant to the Court's November 2, 2020 Standing Order Governing Civil Cases, *see* ECF No. 12; GWU properly filed its Statement of Material Facts Not in Dispute, *see* ECF No. 44-3; Ex. 1 to Def.'s Reply, ECF No. 48-1. However, contrary to the Court's Standing Order and Local Civil Rule 7(h)(1), Mr. Chloe did not file in response a Counter-Statement of Disputed Facts indicating whether he admitted or denied each of GWU's supplied undisputed material facts. As GWU says, Mr. Chloe "made no effort to respond to GW[U]'s Statement of Material Facts and made no effort to attempt to isolate or specifically dispute any part of the record." Def.'s Reply, ECF No. 48 at 3 n.2. As a result, the Court concludes that all the facts proffered in GWU's Statement of Material Facts "are not properly controverted and thus undisputed." Standing Order Governing Civil Cases, ECF No. 12 at 10 ¶ 13(h); Fed. R. Civ. P. 56(e)(2); *see also Murray v. Amalgamated Transit Union*, 183 F. Supp. 3d 6, 16 (D.D.C. 2016) ("In deciding a motion for summary judgment, a court 'may' penalize an opposing party's failure to 'controvert[]' a given fact by 'assum[ing] that facts identified by the moving party in its statement of material facts are admitted.'" (quoting LCvR 7(h)(1))); *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) (accepting as "admitted" the defendant's statement of material facts due to the absence of a counter-statement of disputed facts from the plaintiff). That Mr. Chloe is proceeding *pro se* is irrelevant, as "[c]ourts have made clear that when faced with a motion for summary judgment, a *pro se* plaintiff, just like a represented party, must comply with a court's rules regarding responses to statements of material fact and the need to

Plumber in September 2012. Def.'s Statement of Material Facts Not in Dispute ("SOMF"), ECF No. 44-3 at 1 ¶ 1; Def.'s Ex. A, ECF No. 44-5 at 64-66. Mr. Chloe held the position of Senior Plumber until he was terminated on October 1, 2020, and his work duties as a Senior Plumber required him to be physically on GWU's campus. Def.'s Mem., ECF No. 44-2 at 7.

### 1. Mr. Chloe's Various Periods of Medical Leave During His GWU Employment

While employed by GWU, Mr. Chloe requested and was approved for FMLA leave on four different occasions, in addition to other extended medical leaves. Def.'s SOMF, ECF No. 44-3 at 1 ¶ 2; *see* Def.'s Ex. B, ECF No. 44-6 at 7 (Mr. Chloe's complete "Employee Leave Record"). Mr. Chloe first took continuous FMLA leave from January 23, 2013 until May 5, 2013. Def.'s Ex. B, ECF No. 44-6 at 7; *see* Def.'s Ex. A, ECF No. 44-5 at 67-87 (documents pertaining to Mr. Chloe's 2013 FMLA leave). He was not disciplined or terminated for taking this 2013 FMLA leave. Def.'s SOMF, ECF No. 44-3 at 1 ¶ 4. Mr. Chloe next took continuous FMLA leave from January 7, 2016 until March 6, 2016. Def.'s Ex. B, ECF No. 44-6 at 7; *see* Def.'s Ex. A, ECF No. 44-5 at 88-99 (documents pertaining to Mr. Chloe's 2016 FMLA leave).

---

identify record evidence that establishes each element of his claim for relief." *Anand v. U.S. Dep't of Health & Hum. Servs.*, No. 21-1635, 2023 WL 2645649, at *5 (D.D.C. Mar. 27, 2023) (citation and internal quotation marks omitted).

He was also not disciplined or terminated for taking this 2016
FMLA leave. Def.'s SOMF, ECF No. 44-3 at 2 ¶ 6. The next year,
beginning on July 20, 2017, Mr. Chloe began another continuous
FMLA leave period due to a serious health condition. *Id.* ¶ 7;
Def.'s Ex. B, ECF No. 44-6 at 7. However, he was not able to
return to work after the exhaustion of his FMLA leave on October
11, 2017. Def.'s SOMF, ECF No. 44-3 at 2 ¶ 8. Instead of taking
adverse action, GWU granted Mr. Chloe an accommodation for his
medical conditions, which permitted him to remain on disability
leave until July 2, 2018. *Id.* ¶¶ 9-10; Def.'s Ex. B, ECF No. 44-
6 at 7; *see* Def.'s Ex. A, ECF No. 44-5 at 100-14 (documents
pertaining to Mr. Chloe's 2017 to 2018 FMLA and disability
leave). Mr. Chloe was thus not disciplined or terminated for
taking this leave period in excess of his statutory leave under
the FMLA. Def.'s SOMF, ECF No. 44-3 at 2 ¶ 11.

A few months after returning to work, Mr. Chloe submitted a
doctor's note indicating that he had "an unspecified
'disability'" and could not work for ten days around the
Thanksgiving holiday, from November 16 to 25, 2018. *Id.* ¶ 12;
*see* Def.'s Ex. A, ECF No. 44-5 at 115-16 ("Certificate of
Disability" from Mr. Chloe's physician, clearing him to return
to work on November 26, 2018). Although Mr. Chloe never
identified the specific "disability" referenced in this doctor's

note to GWU, the University did not discipline or terminate him for taking this leave. Def.'s SOMF, ECF No. 44-3 at 3 ¶ 13.

On February 11, 2020, Mr. Chloe requested medical leave due to a serious health condition involving his back. *Id.* at 4 ¶ 24. Although he failed to timely submit the required documentation, *see* Def.'s Ex. A, ECF No. 44-5 at 134-35; he was approved for intermittent FMLA leave on March 26, 2020—his fourth period of FMLA leave during his GWU employment, *id.* at 139. The approved leave period was from February 11, 2020 to January 17, 2021, and the accompanying health care certification stated that Mr. Chloe should be provided leave for two health episodes per month, two days per episode, and one medical appointment per month, *i.e.*, a maximum of five days of intermittent FMLA leave per month. *Id.* GWU informed Mr. Chloe on March 27, 2020 that he was thereafter required to follow his department's absence reporting procedures when calling in each FMLA absence, and if he failed to do so, those absences would "not be approved for FMLA job-protected leave." *Id.* at 143.

Based on this history, GWU argues it "had a long history of granting and permitting [Mr. Chloe] to use all requested medical leaves without interference or any adverse consequence." Def.'s Mem., ECF No. 44-2 at 9.

### 2. Mr. Chloe's Religious Accommodation During His GWU Employment

GWU also argues that it has accommodated Mr. Chloe's "stated religious beliefs that prevented his compliance with certain workplace rules." *Id.* On August 27, 2019, Mr. Chloe requested a religious accommodation with respect to his work uniform and informed GWU that his religious beliefs did not permit him to tuck in his shirt as required of employees in his position. Def.'s SOMF, ECF No. 44-3 at 3 ¶ 14; Def.'s Ex. A, ECF No. 44-5 at 117. In support of his request, Mr. Chloe provided a statement from his "spiritual teacher" T. Allah Bey, a man he met in the park who is not affiliated with any religion. Def.'s SOMF, ECF No. 44-3 at 3 ¶ 16. In his letter, T. Allah Bey stated that the spiritual faith he shares with Mr. Chloe requires them to wear their clothing "loose and free flowing" rather than buttoned or tucked in. *See* Def.'s Ex. A, ECF No. 44-5 at 118.

GWU, through its Equal Employment Opportunity ("EEO") Office, engaged in the interactive process with Mr. Chloe to review and process his religious accommodation request. Def.'s SOMF, ECF No. 44-3 at 3 ¶ 15. On September 18, 2019, the EEO Office asked Mr. Chloe to provide contact information for T. Allah Bey so that the University could speak with him. Def.'s Ex. A, ECF No. 44-5 at 119. Mr. Chloe did not respond to this request, leading GWU to follow up with a second email request on

6

September 20, 2019, asking that he provide the relevant contact information by close of business on September 27, 2019. *Id.* Mr. Chloe again did not respond. Def.'s SOMF, ECF No. 44-3 at 4 ¶ 19. As a result, GWU's EEO Office emailed Mr. Chloe on October 3, 2019 to inform him that it would administratively close his accommodation request if he did not respond with the requested information by close of business on October 7, 2019. Def.'s Ex. A, ECF No. 44-5 at 120. Mr. Chloe responded the next day but did not (and never did) provide the contact information for his "spiritual teacher." Def.'s SOMF, ECF No. 44-3 at 4 ¶ 21.

"Nonetheless, and despite [Mr. Chloe's] failure to timely engage in the process, the University continued an interactive dialogue regarding potential accommodations." *Id.* ¶ 22. GWU emailed Mr. Chloe on October 8, 2019 to inform him that it would "consider alternative accommodations" and asked that he "provide examples of alternative shirts that are not tucked in" so that it could provide him "with a compliant uniform." Def.'s Ex. A, ECF No. 44-5 at 121-22. After an exchange of emails between GWU's EEO Office and Mr. Chloe regarding his "suggested examples of attire accommodation[,]" *see id.* at 121-31; on November 22, 2019, the University formally approved Mr. Chloe's request for a religious accommodation by providing him an alternative work shirt that was not required to be tucked in, *see id.* at 132-33.

7

### 3. GWU's COVID-19 Policy and Mr. Chloe's Refusals to Comply with That Policy or Complete a Religious Accommodation Request

Following the March 2020 onset of the COVID-19 pandemic, GWU stopped in-person classes and transitioned to remote instruction. Def.'s Mem., ECF No. 44-2 at 11. As a result, most GWU employees began working remotely, with the exception of "essential" workers, including plumbers like Mr. Chloe, who were required to continue working on campus due to the nature of their job duties. *Id.* On August 10, 2020, GWU announced new "public health measures to safeguard those who need to be on campus and mitigate, to the extent possible, any potential outbreaks that could burden local health and medical resources." Def.'s Ex. A, ECF No. 44-5 at 144. As a result of these measures, GWU's Facilities, Planning, Construction and Management ("FPCM") division, in which Mr. Chloe worked, began requiring compliance with COVID-19 training, testing, and daily self-monitoring requirements by August 28, 2020. Def.'s SOMF, ECF No. 44-3 at 5 ¶ 29; *see* Def.'s Ex. C, ECF No. 44-7 at 18-22.

On August 26, 2020, Mr. Chloe emailed GWU's EEO Office indicating that he had recently become aware of the mandatory COVID-19 testing and vaccinations policy in order to maintain employment at GWU. Def.'s Ex. A, ECF No. 44-5 at 146. He characterized these measures as "a threat" and informed the University that the policy went "against [his] religious

8

beliefs." *Id.*; *see also id.* at 79:19-80:17 ("I didn't believe in it. I didn't believe that I would be, should be tested [for COVID-19.]"). Mr. Chloe further stated in his email: "I do not take vaccines nor do I have testing done on my body for any reason, the ALL (GOD) provides me with everything I need to be free of any disease or ailments naturally." *Id.* at 146. On August 28, 2020, Ms. Jessica Tischler ("Ms. Tischler") from GWU's EEO Office responded to Mr. Chloe, acknowledging his email as a request for a religious accommodation, "specifically seeking exemption from the COVID-19 testing and the flu shot requirements." *Id.* at 147. Ms. Tischler requested that Mr. Chloe complete the religious accommodation form and submit documentation from his religious leader substantiating his need for the accommodation by close of business on September 2, 2020. *Id.* Although he replied that same day asking GWU to resend the form due to technical issues, which the University did, *id.* at 147-48; Mr. Chloe did not respond by the September 2, 2020 deadline with his completed request or ask for an extension, Def.'s SOMF, ECF No. 44-3 at 7 ¶ 37. Instead, he stopped reporting for work and began taking annual (as opposed to FMLA) leave on Monday, August 31, 2020. *Id.* at 6 ¶ 36; *see* Def.'s Ex. A, ECF No. 44-5 at 152-55 ("Employee Transactions" data).

On September 4, 2020, Ms. Tischler followed up with Mr. Chloe via email, informing him that he was "out of compliance

9

with GW[U]'s return to work requirements of COVID-19 testing[,]"
and that he had until close of business that day to submit the
accommodation form and documentation, or GWU would close his
request. Def.'s Ex. A, ECF No. 44-5 at 148. Mr. Chloe did not
respond to this email with the requisite paperwork, leading the
University to close his request "due to his non-participation in
the interactive process." Def.'s SOMF, ECF No. 44-3 at 7 ¶ 39.
Instead, on September 8, 2020, Mr. Chloe issued a "Notice" to
Ms. Tischler demanding that GWU stop its insistence on COVID-19
testing/vaccinations, which he called unlawful "experiment[s],"
and its requests for information from him in support of a
religious accommodation, which he deemed "constitutional
violation[s]" that were "against [his] religious beliefs."
Def.'s Ex. A, ECF No. 44-5 at 149-50; *see also id.* at 93:8-94:19
(explaining that the "Notice" served to communicate both his
refusal to get tested for COVID-19 and to submit the religious
accommodation form). In this "Notice," Mr. Chloe stated that he
was being "forced" to use annual leave he had not intended to
use at that time, and as a result, he was uncertain if he could
"work to support [his] family because of [his] religious
beliefs." *Id.* at 149. He also informed GWU that he had been on
vacation the week before when he had failed to respond to Ms.
Tischler's communications and that he found out from his
plumbing supervisor upon return from vacation that he was not

10

allowed back on campus. *Id.* He ended this "Notice" by
threatening to sue GWU if it did not "rectify" the situation and
rescind its testing requirements and request for accommodation
information. *Id.* at 150; Def.'s SOMF, ECF No. 44-3 at 7 ¶ 42.
GWU argues that the "Notice" "makes no reference to [Mr.
Chloe's] FMLA leave or related medical condition and makes clear
that his continued use of annual leave was related to his
refusal to comply with [the] University's COVID-19 testing
requirement or the religious accommodation process to request
[an] exemption." Def.'s SOMF, ECF No. 44-3 at 8 ¶ 44.

That same day, Ms. Tischler acknowledged receipt of Mr.
Chloe's "Notice" via email and thanked him for informing GWU
that he was on vacation the prior week. Def.'s Ex. A, ECF No.
44-5 at 156. She provided Mr. Chloe with another copy of the
accommodation request form, in addition to explaining that a
request for a religious accommodation is an interactive process
that requires his participation and aims "to identify whether
there exists a reasonable accommodation" that would allow him to
practice his "sincerely held religious beliefs while not
creating an undue hardship for" GWU. *Id.* She also wrote: "You
mention an experiment in your most recent letter but we are not
asking that you participate in any experiment or research
project and need clarification on this point." *Id.* Instead of
completing the religious accommodation form, Mr. Chloe responded

11

to Ms. Tischler on September 10, 2020 with a "2nd Notice" stating that per his spiritual beliefs, "the ALL (God) provides me with natural foods and herbs that will cure any sickness[.] I also believe that many illnesses come from man's interference such as testing, vaccines, improper eating habits, improper hygiene practices etc." *Id.* at 157. He also insisted that COVID-19 testing is the "definition of [an] experiment," as well as social distancing and wearing a facial mask, none of which he claimed was supported by scientific data or "medical proof." *See id.* at 157-60. Mr. Chloe further wrote that the religious accommodation form "is [a] violation and constitutes a RELIGIOUS TEST" contrary to his rights protected by the U.S. Constitution. *Id.* at 160. This "2nd Notice" makes "no reference to [the] FMLA, [Mr. Chloe's] intent to take any FMLA leave, or any related medical condition." Def.'s SOMF, ECF No. 44-3 at 9 ¶ 50.

Based on Mr. Chloe's "failure to substantively respond or engage in the interactive process," *id.* ¶ 51; GWU closed his religious accommodation request on Friday, September 11, 2020 and advised him via email that he was "expected to schedule a COVID test, take the required training[,] and begin completing the daily symptom screening" by close of business on Monday, September 14, 2020 in order to be cleared to return to work, Def.'s Ex. A, ECF No. 44-5 at 165. GWU also expressly stated that "[f]ailure to adhere to these university requirements for

12

on-site personnel [would] result in disciplinary action, up to and including termination."[3] *Id.* Following receipt of this email, on September 14, 2020, Mr. Chloe sent a "Final Notice" to Ms. Tischler, in which he stated his intent to sue if GWU "decide[d] to violate [his] rights (1789 United States Constitution Clause 3)" and his "religious beliefs" by terminating him for failure to abide by its "new and unnecessary" COVID-19 policy. *Id.* at 163. This "Final Notice" makes "no reference to [the] FMLA, [Mr. Chloe's] intent to take any FMLA leave, or any related medical condition." Def.'s SOMF, ECF No. 44-3 at 10 ¶ 55.

### 4. Mr. Chloe's Refusal of GWU's Final Opportunity to Request a Religious Accommodation, His Placement in Unpaid Leave Status, His Request for Additional FMLA Leave, and His Termination

On September 18, 2020, GWU provided Mr. Chloe with a final opportunity to request a religious accommodation as to the University's COVID-19 policy and procedures. *See* Def.'s Ex. A, ECF No. 44-5 at 166. In a letter delivered to Mr. Chloe via email, Ms. Vickie Fair ("Ms. Fair"), the Assistant Vice President of EEO and Employee Relations, informed him that if he wished "to pursue a new request for religious accommodation relating to the university's requirements that [he] engage in

___
[3] The University also told Mr. Chloe in this email that it was returning three days (24 hours) of annual leave back to him for time when his original request for religion accommodation was pending. *See* Def.'s Ex. A, ECF No. 44-5 at 165.

social distancing, wear a face mask, and be tested weekly for the presence of COVID-19, [he] must submit the required information" by close of business on September 23, 2020. *Id.* at 168. Ms. Fair further stated that "[u]ntil then, . . . if [Mr. Chloe did] not immediately report for work and abide by the above-referenced requirements, [he would] remain in an unpaid leave status[,]"[4] and that if he failed to submit a religious accommodation request by the deadline, his "continued employment at the University [would] be at risk." *Id.*

The following business day, September 21, 2020, Mr. Chloe requested use of intermittent FMLA leave from September 21 to September 25, 2020, *i.e.*, the five days he was allotted each month per his health care certification, through GWU's third-party administrator of the medical leave system, the Lincoln Financial Group ("LFG").[5] Def.'s SOMF, ECF No. 44-3 at 5 ¶¶ 26-27, 11 ¶¶ 60-62. However, Mr. Chloe did not have any medical appointments scheduled until September 25, 2020, and GWU argues that he "thus seemed to 'anticipate' a four-day flare up of his

---

[4] From Monday, August 31, 2020 through Friday, September 18, 2020, Mr. Chloe took paid annual "overdraft" leave, meaning that he did not have accrued annual leave available at the time. *See* Def.'s Ex. A, ECF No. 44-5 at 152-55 ("Employee Transactions" data); Def.'s Mem., ECF No. 44-2 at 16 n.7. As a result, GWU informed him that he was on an unpaid leave status.

[5] GWU explains that it uses LFG to collect medical documentation related to any medical leave, Def.'s Mem., ECF No. 44-2 at 8 n.2; and that individuals using such leave report their FMLA absences directly to LFG, Def.'s SOMF, ECF No. 44-3 at 11 ¶ 61.

back condition." *Id.* at 11 ¶ 63. On September 25, 2020, Mr.
Chloe was examined by his physician for back pain, who concluded
that he could "return to work at full capacity" without
restrictions and completed a return to work form to that effect.
*Id.* ¶ 64; Def.'s Ex. D, ECF No. 44-8 at 26-27.[6] However, Mr.
Chloe did not return to work and continued to designate his
absence as intermittent FMLA leave, despite exceeding the
maximum days permitted per month by his medical certification.
Def.'s SOMF, ECF No. 44-3 at 12 ¶ 65. Mr. Chloe reported to LFG
that the reason for his continued intermittent FMLA absences—
from September 25, 2020 until October 2, 2020, the day after his
termination—was "multiple treatments," even though his physician
had cleared him for work, and he did not have another medical
appointment scheduled until October 5, 2020. *Id.* ¶¶ 66-67;

---

[6] The same doctor, Dr. Alexander Kiefer ("Dr. Kiefer"), who
cleared Mr. Chloe to "return to work at full capacity" following
Mr. Chloe's September 25, 2020 physical examination, *see* Def.'s
Ex. D, ECF No. 44-8 at 26-27 ("Progress Note" of Dr. Kiefer from
his exam of Mr. Chloe); later contradicted himself in a
Physician's Certificate dated October 27, 2020, submitted as
part of Mr. Chloe's request for unemployment benefits following
his termination, *see* Pl.'s Ex. D, ECF No. 47 at 15. In this
certificate, provided to the D.C. Department of Employment
Services, Dr. Kiefer stated that Mr. Chloe was incapacitated
from working due to his back condition from September 18, 2020
to October 26, 2020. Although the Court notes this discrepancy
between the exhibits, it has already accepted as "admitted"
GWU's undisputed material fact that Mr. Chloe was cleared to
return to work by Dr. Kiefer on September 25, 2020. Def.'s SOMF,
ECF No. 44-3 at 11 ¶ 64; *see supra* note 2.

Def.'s Ex. D, ECF No. 44-8 at 48; *see also* Pl's. Exs. E & F, ECF No. 47 at 16-22 (LFG records from this time period).

Instead of submitting a completed religious accommodation request by the September 23, 2020 deadline, on that date Mr. Chloe sent a "Notice and Response" to Ms. Fair and other employees of GWU and its EEO Office stating that "[t]he constitution 'CANNOT' accept the concept of a NEW NORMAL (MASK WEARING, EXPERIMENTS WITH UNPROVEN VACCINES, UNWARRANTED TESTING, VIOLATION OF [HIS] RELIGIOUS BELIEFS ETC.)" Def.'s Ex. D, ECF No. 44-8 at 58. He further emphasized: "I WILL NEVER TAKE ANOTEHR RELIGIOUS TEST, I WILL NEVER ALLOW YOU TO EXPERIMENT [*i.e.*, conduct COVID-19 testing] ON ME PERIOD." *Id.* at 59. Mr. Chloe demanded that "this matter" be resolved by September 25, 2020, following his doctor's appointment, or he would sue GWU. *Id.* Then, on September 28, 2020, Mr. Chloe sent GWU a final "Notice with Intent to Sue" "for violations of [his] rights protected by [the] 1789 Constitution and 1866 Civil Rights Act." *Id.* at 57. Neither the September 23, 2020 "Notice and Response" or the September 28, 2020 "Notice with Intent to Sue" refer to Mr. Chloe's FMLA leave, related medical conditions, or the need for additional time to complete the religious accommodation request. Def.'s SOMF, ECF No. 44-3 at 13 ¶¶ 71, 73.

On October 1, 2020, GWU terminated Mr. Chloe for refusing to "abide by COVID-19 related university policies," and for

16

failing to submit documentation supporting his religious accommodation request.[7] Def.'s Ex. A, ECF No. 44-5 at 171. In Mr. Chloe's termination letter, issued by Mr. David Dent ("Mr. Dent"), the Associate Vice President of the FPCM division, Mr. Dent wrote that "[f]or these reasons," and "most important[ly]" because of Mr. Chloe's refusal "to be tested for the COVID-19 virus (and engage in social distancing among other requirements)[,]" his employment at GWU was terminated, effective October 1, 2020. *Id.* To date, Mr. Chloe's position regarding COVID-19 testing has not changed, and he has never taken a COVID-19 test. *Id.* at 89:3-6.

**B. Procedural Background**

On May 29, 2021, the Court denied GWU's Second Motion to Dismiss, *see* ECF No. 15; concluding that Mr. Chloe "has stated an interference claim [under the FMLA] . . . because he alleges [in the Complaint] that he was fired for not taking a [COVID-19] test that he was unable to take because he was on FMLA leave[,]" and because "he has shown prejudice arising from the interference . . . because his employment was terminated[,]" Mem. Op. & Order, ECF No. 34 at 6 (citation and internal quotation marks omitted). Following this decision, on June 14,

---

[7] GWU has since terminated ten employees for failure to comply with its mandatory COVID-19 vaccination policy and who did not request or receive a medical or religious exemption. Def.'s SOMF, ECF No. 44-3 at 14 ¶ 78.

2021, GWU filed its answer to the Complaint. *See* Def.'s Answer,
ECF No. 35. On November 5, 2021, GWU filed the present Motion
for Summary Judgment along with exhibits, its statement of
undisputed material facts, and a memorandum of points and
authorities in support of its motion. *See* Def.'s Mot., ECF No.
44; Def.'s Mem., ECF No. 44-2; Def.'s SOMF, ECF No. 44-3; Def.'s
Exs. A-D, ECF Nos. 44-5-44-8. On November 18, 2021, Mr. Chloe
contemporaneously filed two documents: (1) a "Motion to Deny,
Respond and Rebut for Defendant's Summary Judgment" [hereinafter
"Pl.'s Opp'n"], *see* ECF No. 46; and (2) a "Judicial Notice of
Adjudicative Fact" that includes exhibits, *see* ECF No. 47. The
Court construes both filings as constituting Mr. Chloe's
opposition, to which GWU replied on December 3, 2021. *See* Def.'s
Reply, ECF No. 48. GWU's Motion for Summary Judgment is now ripe
and ready for the Court's adjudication.

## III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary
judgment should be granted "if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C.
Cir. 2002). The moving party bears the initial burden "of
informing the district court of the basis for its motion, and
identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted). This burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

On the other hand, to defeat summary judgment, the nonmoving party must "go beyond the pleadings" and his "own affidavits, . . . depositions, answers to interrogatories, and admissions on file" to designate specific facts showing that there is a genuine issue of material fact for trial. *Id.* at 324 (citation and internal quotation marks omitted). A material fact is one capable of affecting the outcome of the litigation, while a genuine dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmoving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence" in the record. *Musgrove v. Dist. of Columbia*, 775 F. Supp. 2d 158, 164 (D.D.C. 2011), *aff'd*, 458 F. App'x 1 (D.C. Cir. 2012); *Celotex*, 477 U.S. at 324. Furthermore, in the summary judgment analysis, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## IV. Analysis

To begin, the Court agrees with GWU that although Mr. Chloe has alleged in the Complaint that he was terminated due to his FMLA leave status, *see* Compl, ECF No. 1 at 3; his "non-compliant [o]pposition does nothing to address the merits of the case," Def.'s Reply, ECF No. 48 at 3. Instead of rebutting or disputing, with record support, the material facts GWU proffered in its Statement of Material Facts Not in Dispute, Mr. Chloe's opposition reads as "a blanket and conclusory 'denial' of the University's [m]otion[,]" *id.* at 7; in which his only arguments are that statements of counsel in a brief are hearsay rather than evidence and that GWU "has yet to provide sworn testimony under penalty of perjury," *see* Pl.'s Opp'n, ECF No. 46 at 2-3. However, "the premise of this argument is demonstrably false[,]" as GWU's factual assertions in its statement of material undisputed facts are not only "appropriately advanced by legal counsel" pursuant to the procedures set forth in Federal Rule of Civil Procedure 56 and the Court's Standing Order Governing Civil Cases, *see* ECF No. 12; but also properly rely on record evidence, including Mr. Chloe's own deposition testimony and relevant documents exchanged during discovery that have been appended as exhibits to GWU's motion, *see* Def.'s Reply, ECF No.

48 at 7. The Court is further unpersuaded by the only case Mr. Chloe cites to in his opposition, *Trinsey v. Pagliaro*, 229 F. Supp. 647 (E.D. Pa. 1964), which apart from being nonbinding on this Court, is also inapposite, as it pertains to "unsupported representations of material fact (as opposed to legal argument) made by counsel at oral argument[,]" which is not the case here. Def.'s Reply, ECF No. 48 at 7-8 (citing *Trinsey*, 229 F. Supp. at 649).

Because of Mr. Chloe's deficient opposition, the Court concludes that he has failed to address all of the legal arguments and authorities presented in GWU's Motion for Summary Judgment, in addition to his failure, contrary to his burden as a plaintiff under Rule 56, to file a proper Counter-Statement of Disputed Facts and "identify evidence that a reasonable jury could credit in support of each essential element of [his] claims." *Grimes v. Dist. of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015); *Anand v. U.S. Dep't of Health & Hum. Servs.*, No. 21-1635, 2023 WL 2645649, at *5 (D.D.C. Mar. 27, 2023); *see supra* note 2. Accordingly, because Mr. Chloe had the opportunity to refute GWU's arguments that it "did not retaliate against [him] or interfere with his FMLA rights[,]" Def.'s Mem., ECF No. 44-2 at 7; but did not do so, the Court construes this failure as a waiver of any objection to the arguments in GWU's motion, *see, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284

F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *Stephenson v. Cox*, 223 F. Supp. 2d 119, 121 (D.D.C. 2002) (concluding that because "the plaintiff [had] failed to provide any reason why the court should not treat the motion as conceded[,]" he "had waived any objection to the motion"). Nonetheless, because Mr. Chloe is proceeding *pro se* without the benefit of counsel, the Court briefly addresses GWU's two arguments for why summary judgment should be entered in its favor: (1) Mr. Chloe's retaliation claim under the FMLA fails as a matter of law because GWU had a legitimate, non-retaliatory reason for his termination, and (2) the undisputed evidence confirms that GWU did not unlawfully interfere with Mr. Chloe's FMLA rights.[8] *See* Def.'s Mem., ECF No. 44-2 at 22-32; *see, e.g.*, *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 116 (D.D.C. 2009) (affording greater latitude to *pro se* plaintiffs than

---

[8] As GWU notes, Mr. Chloe "alleges that his termination violated the FMLA without expressly identifying the legal theory under which he seeks to proceed." Def.'s Mem., ECF No. 44-2 at 21. However, drawing all inferences in Mr. Chloe's favor, and following GWU's summary judgment briefing, the Court determines that it must address Mr. Chloe's FMLA claims under a retaliation theory and an unlawful interference theory.

those with counsel or who are themselves practicing attorneys).
Overall, GWU argues that Mr. Chloe's termination "was wholly
unrelated to [his] use of FMLA leave[,]" Def.'s Mot., ECF No. 44
at 1; and that both claims under the FMLA must fail because Mr.
Chloe's "termination would have occurred regardless of his use
of intermittent FMLA leave[,]" Def.'s Mem., ECF No. 44-2 at 21.
The Court addresses each of GWU's arguments in turn.

### A. Mr. Chloe's Retaliation Claim Under the FMLA Fails as a Matter of Law

The FMLA provides that it is unlawful for an employer "to
interfere with, restrain, or deny the exercise of or the attempt
to exercise, any right provided under this subchapter[,]" or "to
discharge or in any other manner discriminate against any
individual for opposing any practice made unlawful by this
subchapter." 29 U.S.C. § 2615(a)(1)-(2). "As relevant here, a
plaintiff may bring retaliation claims under § 2615(a)(1) by
alleging an employer discriminated against [him] for taking FMLA
leave." *Waggel v. Geo. Wash. Univ.*, 957 F.3d 1364, 1375 (D.C.
Cir. 2020) (citations omitted). The Court of Appeals for the
District of Columbia Circuit ("D.C. Circuit") has "imported
Title VII's prima facie case and burden-shifting regime to the
FMLA retaliation context," *Gordon v. U.S. Capitol Police*, 778
F.3d 158, 161-62 (D.C. Cir. 2015) (citing *Gleklen v. Democratic
Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1367-68 (D.C. Cir.

23

2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))); such that to state a retaliation claim under the FMLA, Mr. Chloe must establish "that [he] engaged in a protected activity under th[e] statute; that [he] was adversely affected by an employment decision; and that the protected activity and the adverse employment action were causally connected[,]" *Gleklen*, 199 F.3d at 1368. Upon this showing, the burden shifts to GWU "to articulate a legitimate, non-retaliatory reason for its actions[,]" and if it does so, the burden returns to Mr. Chloe to prove that the "asserted non-retaliatory reason was mere pretext for retaliation." *Carter-Frost v. Dist. of Columbia*, 305 F. Supp. 3d 60, 73 (D.D.C. 2018) (citing *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)). The central question thus becomes "whether, based on all the evidence, a reasonable jury could conclude that [the] proffered reason for" Mr. Chloe's termination was pretext for retaliation for him using FMLA leave. *Pardo-Kronemann v. Donovan,* 601 F.3d 599, 604 (D.C. Cir. 2010). In other words, the Court need not consider whether Mr. Chloe "has actually satisfied the elements of a prima facie case if [GWU] has offered a legitimate, non-[retaliatory] reason for its actions." *Musgrove*, 775 F. Supp. 2d at 169 (citing *Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

24

### 1. GWU Has Asserted a Legitimate, Non-Retaliatory Reason for Mr. Chloe's Termination

A legitimate, non-retaliatory reason is a "clear and reasonably specific" explanation for an employer's actions, *i.e.*, "simply explain[ing] what [it] has done or produc[ing] evidence of" that reason. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256-58, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (internal quotation marks omitted). "[I]n all instances where a defendant has asserted a legitimate, non-[retaliatory] reason for its conduct, the Court shall evaluate all of the evidence in the record" when assessing the legitimacy of that reason. *Washington v. Chao*, 577 F. Supp. 2d 27, 39 (D.D.C. 2008). Here, GWU states that its legitimate, non-retaliatory reason for terminating Mr. Chloe was "his stated refusal to ever comply with" the University's COVID-19 policy that was mandatory for all FPCM employees such as himself. Def.'s Mem., ECF No. 44-2 at 23. That policy required compliance with COVID-19 training, testing, and daily self-monitoring requirements and other safety precautions, including wearing facial masks and social distancing. Def.'s SOMF, ECF No. 44-3 at 5 ¶ 29; *see* Def.'s Ex. C, ECF No. 44-7 at 18-22.

It is undisputed that Mr. Chloe refused to comply with these requirements, repeatedly stating that they went against his religious beliefs, that he should not be vaccinated against

25

or tested for COVID-19, and that he would "NEVER" comply with the policy's mandate. *See, e.g.*, Def.'s Ex. A, ECF No. 44-5 at 79:19-80:17, 93:8-94:19, 146, 157-60, 163; Def.'s Ex. D, ECF No. 44-8 at 58-59; Def.'s SOMF, ECF No. 44-3 at 5-6 ¶¶ 30-33, 7 ¶¶ 40-43, 8-9 ¶¶ 47-48, 10 ¶ 54, 12-13 ¶¶ 68-69, 14 ¶ 77.

It is also undisputed that Mr. Chloe refused to engage in the interactive process so that GWU could determine whether an accommodation may have been available based upon a sincerely held religious belief and instead claimed that being forced to submit the accommodation paperwork was a violation of his constitutional rights. *See, e.g.*, Def.'s Ex. A, ECF No. 44-5 at 93:8-94:19, 160; Def.'s SOMF, ECF No. 44-3 at 7 ¶¶ 39-40, 9 ¶ 49, 10 ¶ 54. The record shows that GWU expressly informed Mr. Chloe, prior to him taking any intermittent FMLA leave in 2020, that failure to comply with its COVID-19 policy could "result in disciplinary action, up to and including termination." Def.'s Ex. A, ECF No. 44-5 at 165; Def.'s SOMF, ECF No. 44-3 at 9 ¶¶ 51-52, 10-11 ¶¶ 57-59.

As a result of Mr. Chloe's communications indicating his clear, continued refusal to comply with GWU's COVID-19 policy or to participate in the religious accommodation process, the University terminated him on October 1, 2020, stating in Mr. Chloe's termination letter that he was being fired "most important[ly]" because of his refusal "to be tested for the

COVID-19 virus (and engage in social distancing among other requirements)." Def.'s Ex. A, ECF No. 44-5 at 171; *see also* Def.'s SOMF, ECF No. 44-3 at 13 ¶ 74 (stating that Mr. Chloe was terminated both for refusing to abide by GWU's COVID-19 testing and safety measures and for failing to provide any documentation to support a religious accommodation request). The Court therefore concludes that GWU has stated a legitimate, non-retaliatory reason for Mr. Chloe's termination.

### 2. Mr. Chloe Has Failed to Produce Sufficient Evidence That GWU's Stated Reason for His Termination Was Pretextual

Having asserted a legitimate, non-retaliatory explanation for Mr. Chloe's termination, the burden shifts back to Mr. Chloe to demonstrate that GWU's stated reason "was mere pretext for retaliation[,]" *Carter-Frost*, 305 F. Supp. 3d at 73; which he can do by "presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence[,]" *Musgrove*, 775 F. Supp. 2d at 169 (citation and internal quotation marks omitted); *see also Allen v. Johnson*, 795 F.3d 34, 39-40 (D.C. Cir. 2015) ("A plaintiff opposing summary judgment may raise an inference that the employer's purpose was retaliatory by pointing to evidence attacking the employer's proffered reasons, together with other evidence, if any, suggesting that retaliation was the real reason."). The sole remaining question is thus whether Mr. Chloe

has produced sufficient evidence for a reasonable jury to find
that GWU's asserted reason for terminating him "was not the true
reason" and that it "intentionally discriminated or retaliated
against" him for exercising his FMLA rights. *Miles v. How.
Univ.*, 653 F. App'x 3, 7 (D.C. Cir. 2016). Ultimately, the Court
"may not second-guess" GWU's decision to terminate Mr. Chloe
"absent [such a] demonstrably discriminatory motive." *Davis v.
Geo. Wash. Univ.*, 26 F. Supp. 3d 103, 119 (D.D.C. 2014).

Although Mr. Chloe alleges that he was terminated for
taking intermittent FMLA leave, as opposed to his refusal to
comply with GWU's mandatory COVID-19 policy or complete the
religious accommodation paperwork, *see* Compl., ECF No. 1 at 3;
Def.'s Ex. A, ECF No. 44-5 at 132:3-134:13; the Court concludes
that he has failed to meet his burden to produce sufficient
evidence that GWU's stated reason for his termination was
pretextual. First, as GWU argues, "[t]he undisputed evidence
demonstrates that [Mr. Chloe] started to use his intermittent
FMLA leave only after extended communications with the
University regarding his non-compliance with University policies
and directives, being placed on unpaid leave, and being advised
that his conduct [might] lead to termination." Def.'s Mem., ECF
No. 44-2 at 21. The record shows that Mr. Chloe first began
communicating with GWU regarding his refusal to abide by its
COVID-19 policy on August 26, 2020, *see* Def.'s Ex. A, ECF No.

44-5 at 146; well before he took any intermittent FMLA leave in 2020, *see* Def.'s SOMF, ECF No. 44-3 at 11 ¶ 60; Pl.'s Ex. F, ECF No. 47 at 22. Between August 26, 2020 and September 23, 2020, Mr. Chloe "vehemently advised the University on at least four occasions that he would not comply, *i.e.*, he would not be tested or comply with the COVID-19 policy at any time, ever[,]" and that he would not complete the religious accommodation request form. Def.'s Reply, ECF No. 48 at 4 (citing Def.'s SOMF, ECF No. 44-3 at 5-6 ¶¶ 31-33, 7 ¶¶ 40-43, 8-9 ¶¶ 47-49, 10 ¶¶ 53-54, 12 ¶¶ 68-69); *see also* Def.'s Ex. A, ECF No. 44-5 at 146 (Mr. Chloe's August 26, 2020 email to GWU's EEO Office), 149-51 (Mr. Chloe's September 8, 2020 "Notice" to Ms. Tischler), 157-61 (Mr. Chloe's September 10, 2020 "2nd Notice" to Ms. Tischler), 162-64 (Mr. Chloe's September 14, 2020 "Final Notice" to Ms. Tischler); Def.'s Ex. D, ECF No. 44-8 at 58-59 (Mr. Chloe's September 23, 2020 "Notice and Respond" to GWU and its EEO Office).

GWU informed Mr. Chloe via email on September 11, 2020 that his failure to abide by its COVID-19 policy could result in his termination, *see* Def.'s Ex. A, ECF No. 44-5 at 165; and it again repeated this warning on September 18, 2020 via letter, in which it provided him with a final opportunity to submit an accommodation request despite his prior failures to engage in the interactive process, *see id.* at 166-68 (cautioning that failure to submit an accommodation request would place Mr.

Chloe's "continued employment at the University . . . at risk"). All these events occurred *before* Mr. Chloe began taking intermittent FMLA leave on September 21, 2020, which was also almost one month after the original deadline for compliance with GWU's COVID-19 policy—August 28, 2020. Def.'s SOMF, ECF No. 44-3 at 5 ¶ 29, 11 ¶ 60.

The record therefore indicates that Mr. Chloe's use of intermittent FMLA leave, starting on September 21, 2020 and continuing until his termination on October 1, 2020, *see id.* at 11 ¶ 62, 12 ¶ 66; Pl.'s Exs. E & F, ECF No. 44-7 at 16-22; "had no impact on his ability to comply with [GWU's COVID-19] requirements[,]" *see* Def.'s Reply, ECF No. 48 at 1, 3 ("The fact that [Mr. Chloe] claimed FMLA leave on the eve of his termination[] had nothing to do with the decision to terminate."). As GWU explains, the "wheels were already in motion" for terminating Mr. Chloe with respect to his non-compliance with the University's COVID-19 policy at the time he invoked his intermittent FMLA leave, Def.'s Mem., ECF No. 44-2 at 26; and this FMLA status could not be used to "prevent an otherwise legitimate" firing, Def.'s Reply, ECF No. 48 at 6; because "an employee who requests FMLA leave is not protected from a dismissal [that] would have occurred regardless of the employee's request for or taking of FMLA leave[,]" *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 43 (D.D.C. 2020) (citation and

internal quotation marks omitted), *reconsidered in part on other grounds by Savignac v. Day*, 539 F. Supp. 3d 107 (D.D.C. 2021). Because GWU's "dissatisfaction" with Mr. Chloe's refusal to abide by its COVID-19 directives and its "intentions to terminate him predated his [FMLA] protected activity," the Court concludes that any retaliatory discharge claim is "illogical" and that no reasonable juror could conclude that his termination was caused by his FMLA leave status. *Carter v. Greenspan*, 304 F. Supp. 2d 13, 30 (D.D.C. 2004); *see also Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001) ("Because the termination process had already been initiated, following on the heels of repeated warnings . . . , no reasonable juror could conclude that the termination had been caused by the [protected] activity."), *aff'd*, No. 01-5309, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002). Indeed, "imposing disciplinary measures [is] legitimate[ly] [ ] warranted after" an employee violates his employer's policies and procedures. *Carter-Frost*, 305 F. Supp. 3d at 71; *see also Howard v. Fed. Express Corp.*, 316 F. Supp. 3d 234, 243 (D.D.C. 2018) ("Given that [t]he most common legitimate reason on which an employer might rely in disciplining an employee would be that the employee had violated an employment regulation or policy, Defendants have offered a legitimate, nondiscriminatory reason for firing Plaintiffs." (citation and internal quotation marks omitted)).

Accordingly, even though Mr. Chloe was terminated shortly after going on FMLA leave, this temporal proximity alone "cannot establish pretext absent other, independent evidence." *Ball v. Geo. Wash. Univ.*, No. 17-507, 2019 WL 1453358, at *11 (D.D.C. Mar. 31, 2009), *aff'd*, 798 F. App'x 654 (D.C. Cir. 2020); *see also Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 138 n.17 (D.D.C. 2014) ("Although close proximity in time [between an employee's most recent FMLA leave and a subsequent adverse employment action] may establish a causal connection to make out a prima facie case of retaliation, more is required to establish pretext."), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016); *Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 283 (D.D.C. 2017) ("[T]he fact that Plaintiff was on FMLA leave when she was fired, by itself, is not enough to get past summary judgment."). However, the record shows that Mr. Chloe has failed to identify other facts or evidence that would indicate GWU's stated reason for terminating him was pretextual. For example, in his deposition, Mr. Chloe said that he had no facts other than "the fact that [he] was on FMLA [leave]" to "support a contention that the real reason that GW[U] fired [him] was" for exercising his FMLA rights. Def.'s Ex. A, ECF No. 44-5 at 133:3-6, 145:7-17; Def.'s SOMF, ECF No. 44-3 at 14 ¶ 75. In addition, Mr. Chloe's various "notices" that he sent to GWU never mention the FMLA, an intent to take FMLA leave, or any of the related medical conditions for

which he was previously approved for intermittent FMLA leave.
*See* Def.'s SOMF, ECF No. 44-3 at 8 ¶ 44, 9 ¶ 50, 10 ¶ 55, 13 ¶¶
71, 73; *see also* Def.'s Reply, ECF No. 48 at 4 (explaining that
Mr. Chloe never informed GWU: "(a) that he could not submit to
testing because he was on FMLA leave; (b) that he would submit
to testing after he returned to work from FMLA leave; or (c) his
belief that the University's actions violated the FMLA").
Instead, Mr. Chloe's written statements to GWU demonstrate that
he understood he could be terminated for not complying with the
University's COVID-19 policy or participating in the religious
accommodation process, but that he nonetheless chose to
communicate his unequivocal refusal to ever submit to COVID-19
testing and/or vaccination or to provide the requisite
accommodation paperwork, both before and after he was granted
FMLA leave.[9] *See, e.g.*, Def.'s Ex. A, ECF No. 44-5 at 162-63;

---

[9] In his deposition, Mr. Chloe indicated that he may have sent
correspondence to GWU on September 28, 2020 indicating that he
would "change [his] mind" about COVID-19 testing after he went
to the doctor. *See* Def.'s Ex. A, ECF No. 44-5 at 132:16-134:13.
However, any such correspondence is not in the record, and even
if it was, it would not be enough to disprove the reasonableness
of GWU's stated reason for Mr. Chloe's termination given his
prior "notices" clearly indicating his intent to "NEVER" submit
to COVID-19 testing, *see, e.g.*, Def.'s Ex. D, ECF No. 44-8 at
59; and his deposition testimony that his position on such
testing has not changed, Def.'s Ex. A, ECF No. 44-5 at 89:3-6;
*see Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 495
(D.C. Cir. 2008) ("If the employer's stated belief about the
underlying facts is reasonable in light of the evidence, . . .
there ordinarily is no basis for permitting a jury to conclude
that the employer is lying about the underlying facts.").

Def.'s Ex. D, ECF No. 44-8 at 58-59. And, Mr. Chloe's termination letter specifically confirmed that he was fired because he "failed to abide by university COVID-19 related requirements or to submit a new application for an accommodation[.]" Def.'s Ex. A, ECF No. 44-5 at 171. Finally, none of Mr. Chloe's proffered exhibits raise a genuine dispute of material fact that his termination resulted from his FMLA leave status, instead only confirming GWU's factual assertion that LFG approved him for intermittent FMLA leave from September 21, 2020 to October 2, 2020.[10] *Compare* Pl.'s Exs. B, E, & F, ECF No. 47 at 12, 16-22, *with* Def.'s SOMF, ECF No. 44-3 at 4-5 ¶¶ 25-27, 12 ¶ 66.

Instead of proffering any evidence that GWU's asserted reason for terminating him was false, Mr. Chloe has only argued,

---

[10] Mr. Chloe has included a copy of the Civil Rights Act of 1866, 42 U.S.C. § 1981, in his exhibits, *see* Pl.'s Ex. A, ECF No. 47 at 5-11; but he has not "asserted any such claim in this case," and he "cannot amend his complaint now through these filings submitted in response to the University's Motion for Summary Judgment[,]" Def.'s Reply, ECF No. 48 at 5; *see, e.g.*, *SAI v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 234 (D.D.C. 2018) ("[A] plaintiff—even a *pro se* plaintiff—may not amend the complaint by raising an issue for the first time in a brief in opposition to a motion for summary judgment[.]"). Because "it is inappropriate for a Court to consider new claims raised for the first time in a brief in opposition to a motion for summary judgment[,]" *Wright v. U.S. Dep't of Just.*, 121 F. Supp. 3d 171, 183 n.7 (D.D.C. 2015); the Court will also not consider any "tortious interference" claim that Mr. Chloe may have intended to raise for the first time in his opposition, *see* Pl.'s Opp'n, ECF No. 46 at 3; an intent which is not clear from the language in his brief, *see* Def.'s Reply, ECF No. 48 at 10 n.6.

as stated in his deposition, that he no longer needed to comply
with GWU's COVID-19 requirements if he was not physically on
campus. Def.'s SOMF, ECF No. 44-3 at 14 ¶ 75 (citing Def.'s Ex.
A, ECF No. 44-5 at 132:22-134:13, 144:1-145:17). After he
learned about the University's COVID-19 policy on or before
August 26, 2020, Mr. Chloe did not report to work on campus,
starting after August 28, 2020 (the deadline for compliance with
GWU's COVID-19 requirements) and continuing throughout the
entirety of his September 2020 intermittent FMLA absences. *See*
*id.* at 6 ¶ 36, 11 ¶ 62, 12 ¶¶ 65-66. He began this absentee
period first by taking annual leave starting on August 31, 2020—
leave which amounted to overdraft leave because he had not yet
accrued that time off—and then switched to intermittent FMLA
leave from September 21, 2020 until the date of his termination.
*Id.* at 6 ¶ 36, 11 ¶ 62, 12 ¶ 66. GWU contends that Mr. Chloe's
"argument is essentially that he could continue to avoid his
employer's requirements and termination by finding different
reasons to be absent from work." Def.'s Mem., ECF No. 44-2 at 25
n.10. The Court agrees that this argument fails to establish
pretext for discrimination or retaliation by GWU in regard to
Mr. Chloe's FMLA rights, *see Diggs v. Potter*, 700 F. Supp. 2d
20, 50 (D.D.C. 2010) (finding that an employee's "disagreement"
with his employer's policy would not cause a reasonable jury to
find that the employer's termination reason—failure to submit

required documents—was pretext for discrimination); especially since Mr. Chloe did not report to work in excess of his annual leave *and* the five days of intermittent FMLA leave he was allotted per month by his health care certificate, *see* Def.'s SOMF, ECF No. 44-3 at 6 ¶ 36, 12 ¶ 65.

Finally, "[l]ack of pretext is further demonstrated by, among other things, [a p]laintiff's previous use of FMLA leave," an employer's prior approvals of such FMLA leave, and ongoing communications between the two regarding the plaintiff's medical conditions, all of which is the case here. *See Crowell v. Denver Health & Hosp. Auth.*, No. 12-cv-00019, 2013 WL 788087, at *6 (D. Colo. Mar. 1, 2013). GWU previously granted each of Mr. Chloe's requests for FMLA leave without issue and also granted him an accommodation for his medical conditions in 2017, enabling him to stay on disability leave even after he exhausted his FMLA leave for that year. *See* Def.'s SOMF, ECF No. 44-3 at 1-2 ¶¶ 2-13. The University has a history of working with Mr. Chloe to accommodate his medical issues, in addition to his religious beliefs, as evidenced by its communications with Mr. Chloe regarding his request for a religious accommodation regarding his work uniform and its approval of this request on November 22, 2019. *See id.* at 3-4 ¶¶ 14-23.

Accordingly, the Court concludes that Mr. Chloe has failed to point to any evidence allowing a reasonable jury to conclude

that GWU's stated reason for his termination was pretext for retaliation for exercising his FMLA rights, and it **GRANTS** summary judgment in GWU's favor on this retaliation claim.

### B. Mr. Chloe's Unlawful Interference Claim Under the FMLA Fails as a Matter of Law

"[A] plaintiff may [also] bring interference claims under [29 U.S.C.] § 2615(a)(1)" of the FMLA. *Waggel,* 957 F.3d at 1375. "To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Id.* at 1376 (citing *Gordon*, 778 F.3d at 164-65; *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010)). "Prejudice exists where an employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief." *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 144 (D.D.C. 2010) (citing 29 U.S.C. § 2617(a)(1)).

GWU argues that it is entitled to summary judgment on Mr. Chloe's interference claim under the FMLA because "the undisputed evidence confirms that the University planned to terminate [Mr. Chloe] for repeated refusals to comply with University policies and directives prior, and without regard, to

his taking intermittent FMLA leave." Def.'s Mem., ECF No. 44-2 at 28. The Court agrees.

"Although terminating a person's employment necessarily interferes with the person's rights under the [FMLA], an employer is not liable for interference with FMLA rights if it can prove it would have fired the employee even if [he] had not taken leave." *Long*, 263 F. Supp. 3d at 288 (citations omitted); *see also Savignac*, 486 F. Supp. 3d at 43-44 ("An employee terminated for reasons not related to his or her FMLA request or leave . . . lacks an interference claim, even if termination effectively denie[s] [an] FMLA leave request." (citation and internal quotation marks omitted)). In other words, the FMLA does not "protect an employee's job against a legitimate, unrelated, reason for separation from employment." *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 155 (D.D.C. 2012), a*ff'd sub nom. Hopkins v. Grant Thornton, LLP*, 529 F. App'x 1 (D.C. Cir. 2013). Here, for the same reasons that the Court concluded that GWU has stated a legitimate, non-retaliatory reason for Mr. Chloe's termination, specifically his continued refusal to comply with the University's COVID-19 policy or submit the paperwork for engaging in the interactive accommodations process, the Court also concludes that Mr. Chloe would have been terminated "regardless of [his] request for or taking of FMLA leave." *Hopkins*, 529 F. App'x at 3; *see also*

Def.'s Reply, ECF No. 48 at 3 (contending that GWU's legitimate,
non-retaliatory reason for terminating Mr. Chloe's employment
"is dispositive of both [his] Retaliation and FMLA Interference
claims"). Therefore, although Mr. Chloe was on intermittent FMLA
leave when he was terminated on October 1, 2020, *see* Pl.'s Exs.
E & F, ECF No. 47 at 16-22; GWU is not liable for interfering
with his FMLA rights because it has produced sufficient evidence
that "it would have made the same decision [to terminate Mr.
Chloe] had [he] not exercised [his] FMLA rights[,]" *Throneberry
v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005).
As GWU argues, Mr. Chloe "cannot stop the termination process
simply by designating absences as intermittent FMLA leave."
Def.'s Mem., ECF No. 44-2 at 32.

Furthermore, there is no evidence in the record that Mr.
Chloe was prevented from taking a COVID-19 test, or otherwise
complying with GWU's COVID policy, because of his use of
intermittent FMLA leave starting on September 21, 2020. GWU
announced its new policy on August 10, 2020 and set a compliance
deadline of August 28, 2020. Def.'s SOMF, ECF No. 44-3 at 5 ¶¶
28-29. Thus, almost a full month passed between this deadline
and the first day of Mr. Chloe's 2020 intermittent FMLA leave,
during which time Mr. Chloe could have complied with the policy
requiring testing and participation in COVID-19 training. Mr.
Chloe also made clear to GWU through his various "notices," both

before and during his 2020 intermittent FMLA leave, that not only would he not submit to COVID-19 testing, but he also would not complete the religious accommodation form that GWU needed to determine if he was entitled to an exemption. *See, e.g.*, *id.* at 7-8 ¶¶ 42-43, 9 ¶ 49, 13 ¶ 72. This evidence, in addition to the undisputed fact that GWU extended the deadline for Mr. Chloe to complete the accommodation request form numerous times, demonstrates that he was not prevented from completing the form because he was on FMLA leave. *See, e.g.*, *id.* at 8 ¶¶ 45-46, 10 ¶¶ 56-57. Instead, the record shows that Mr. Chloe only took FMLA leave *after* being placed in an unpaid leave status for not reporting to work and having insufficient accrued annual leave, and *after* being warned that his "continued employment with the University [was] at risk" if he did not begin abiding by GWU's COVID-19 policy or submit an accommodation request.[11] *Id.* at 10-11 ¶¶ 57-59.

---

[11] The record indicates that Mr. Chloe attempted to abuse his intermittent FMLA leave rather than use it for its intended purpose. *See* Def.'s Mem., ECF No. 44-2 at 29 n.13. Mr. Chloe was only approved for five days of intermittent FMLA leave per month (two episodes per month, two days per episode, and one medical appointment per month). Def.'s SOMF, ECF No. 44-3 at 5 ¶ 27. However, he reported FMLA leave for "multiple treatments" from September 21, 2020 to October 2, 2020, *see* Pl.'s Exs. E & F, ECF No. 47 at 16-22; and yet, his medical records indicate that his only medical appointment during that time was on September 25, 2020, Def.'s SOMF, ECF No. 44-3 at 11-12 ¶¶ 63-67.

40

As such, the undisputed facts support GWU's argument that Mr. Chloe's "termination related to policy violations and conduct pre-dating any use of FMLA leave[,]" and that his unlawful interference claim must fail as a matter of law. Def.'s Mem., ECF No. 44-2 at 31. Accordingly, the Court **GRANTS** summary judgment in GWU's favor on this claim.

### V.   Conclusion

For the foregoing reasons, GWU's Motion for Summary Judgment, ECF No. 44, is **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**September 22, 2023**